Good morning, Your Honors. Welcome, Judge Tallman. This is a case that has a lot of disagreement in it, and I think it's important first to start off and outline a little bit of what we do agree about. The genesis of this case is a claim for contributory trademark infringement. One of the things that is agreed upon and not disputed is this is a judicially created cause of action, and as a consequence, it needs to be narrowly applied and interpreted. Another thing that I think is in agreement is this involves an alleged trademark infringement, which is kind of on its face for reasons I frankly don't fully fathom, is harder to prove infringement than a copyright. And the third thing that I think we agree on is that a trademark owner or holder is obligated to be the primary policer of the trademark in issue. All of that becomes important because my clients operated a 131,000 square foot mall. It had many, many, many tenants. They were all subject to a lease. During the course of their operation of the mall, there were times when certain of the tenants, amongst more than 100, that were caught selling counterfeit goods. When my clients were notified this by L'Exotica for the first time, it was in the form of just a generic letter that says counterfeiting is bad and people there are selling counterfeit products. That started an odyssey for my clients where they, in almost a nonstop fashion, acknowledged by the trial court in the order, trying to fix the problem, whether it be putting up signs or doing other things. But more specifically, and one thing that I think resonates throughout this case is my clients on multiple occasions specifically asked L'Exotica for help. And that help wasn't just an idle time killing request for help because as we learned during the trial of this case, walking in and looking at items isn't something that most people can do and determine counterfeit goods. In fact, not even Homeland Security has people on staff sufficiently qualified to identify a counterfeit good. My understanding is that the sunglasses were being sold for somewhere in the neighborhood of $15 a pair. That's correct. Does the original person seeing the Ray-Ban insignia think that this is not possible, that they could sell for $15 a pair? Well, you say that except you can buy Ray-Ban, particularly Oakley sunglasses on Sierra Trading Post for a very, very low discount. But in fact, during the course of the operation of the mall, things like polo shirts were thought to be counterfeit. In fact, they weren't. They were closed stores, things like that. And keep in mind that just the simple resale of Oakley products doesn't require a license or permit or anything. It's free commerce. But the price itself isn't that big an issue because you can find these discounted things all over. Now, according to L'Exotica, what they were able to locate were, in fact, counterfeit. We have to take their word for it. Homeland Security has to take their word for it. There's been no conviction, by the way, arising from any of these seizures. But as this moved along with my clients asking for help, both from the law enforcement side refused for reasons I don't understand. Can contributory trademark infringement be found based on willful blindness? Your Honor, I believe that willful blindness is, if there's an adequate notice that kind of triggers the action, then I think the obligation becomes to show willful blindness. Well, there's notice because at the trial there was testimony by Greg Dickerson, the mall security officer, who said he notified L'Exotica of counterfeit sales and raids. They knew that there were two raids in 2014 and 2015 by law enforcement with seizures of over 3,000 counterfeit items. There were arrests, there were letters to your client's attorneys notifying them of counterfeit sales after undercover purchases by L'Exotica agents. That seems enough to establish willful blindness to support and contribute. What's missing? It would be if we did nothing. But we didn't do nothing, and in fact as the trial court did a great job in an enumerated passage in her order, she outlined all of the things we did, which started with trying to... What was the most significant thing that your client did? We placed signs throughout the mall that said not only is the sale of any Oakley or Ray Ban item prohibited, but the purchase is also prohibited. And why that's significant, Your Honor, is because through a timeline that is established by the record... Why can't the jury determine that's not enough? Because it becomes a negligence standard then. And the other thing that we do agree on here is that not even gross negligence on the part of my clients is sufficient to show liability. Did your clients ever terminate any of the leases of some of these offending tenants? They did their dead level best, and that's one of the requests for help. They attempted a dispossessory on one particular tenant, sought with subpoena the aid of Lexotica to present evidence that would support the you're selling counterfeit goods and that's a breach and you have to leave. Lexotica did not appear in the dispossessory court, denied the dispossessory. What my client... So they didn't want? Pardon? They made one attempt? Well, yeah, and learned that we'd get no help, and we don't have the... court and say, yes, this is in fact counterfeit. It becomes a, it's been alleged, and what we actually did a better job of is we just simply non-renewed leases. That was our best term. The other significant thing... But I thought there were tenants that had been raided multiple times. Your Honor, the significant thing is, is if you look carefully at the record, there aren't repeat offenders here. It was a little bit like as a kid, I played whack-a-mole. I loved it. I couldn't understand why my dad didn't want to play all the time, but he didn't. But there was a little bit of that element, and all the while, we're asking for Lexotica's help. Tell us, tell us, tell us. And the notable thing about the notice we received, Your Honor, is it was always after the fact. We did this last... I guess I've got the same problem that Judge Wilson does. I mean, we're looking at an extensive period of time, counsel. So we're looking at multiple undercover purchases, multiple letters, multiple law enforcement raids and seizures, and they tried to initiate a dispossessed reaction as to one tenant, and that's it over the entire years we're talking about? The multiple raids, and in fact, you need to understand that some of those occurred before my clients even operated the mall. The multiple letters. The first letter we got just said, counterfeiting is bad. We said, help us. No. The second letter gave us very specific information and said, I believe you've got 10 days in which to fix this problem. They sued seven days later, though. The fact is, is our concern of a wholesale just, we're going to grab a strong arm and kick that person to the curb. We had leases, and that's an important issue because many of the cases dealing with this are flea market cases, which are licensed cases. People who go to flea markets have licenses, and the person can walk up and say, you, you're gone. They can do it at a Braves game. They can do it at a flea market. We have written leases for a one-year term, and there is truth to the matter. We could have, in a wholesale fashion, walked through just throwing people out left, right, and center at our own peril. And again, when you're talking about the primary policer of the trademark being L'Exotica, and inexplicably refusing to help at any level, and we didn't ask for this gratis. We offered to pay for them to help us. And it's just very difficult to come up with the notion that that's willfully blind. Well, they say it wasn't their responsibility to police them all, it was your responsibility to police them all. False. And in fact, there was even testimony that your clients expected the tenants to lie about selling counterfeit goods. When we were told, why don't you just ask them, our people said, and really, they're going to tell the truth to us? That was that exchange. This idea of primary policing, even in the context of the Tiffany v. eBay case, which we think governs, the court said, Tiffany has the primary obligation to police. And the root problem is, is rather than apply the Second Circuit decision in Tiffany v. eBay, the court simply said. That was an online marketplace case. This case is more like Coach v. Goodfellow, right? Well, Coach v. Goodfellow, Your Honor, in fact, is somewhat of a red herring in this regard. Liability was established because the defendants didn't respond to a motion for summary judgment in that case. There was no detailed discussion of what they did, didn't do, or otherwise. They simply didn't respond to the motion. And thereafter. But the evidence was pretty similar. There was notice, letters from the plaintiff and police, several market raids, and the Goodfellow continued to rent space at the flea market to vendors that he should have known were engaged in infringing activity. Flea market? Flea market. All right. It was a license. He could choose to say, no, you can't come back, one. Two, we didn't continue to lease. We killed leases as soon as we could on our own. All right. Thank you, Mr. Dykman. We'll hear from Mr. Mayfoot. May it please the Court, Mr. Dykman and I do not agree on the presentation of the evidence at trial. But first, what I would like to say is that this Court's rulings in Duty Free Americas and Minimaid provide ample guidance to this Court for their manner in which this case, a brick-and-mortar flea market, should be evaluated to determine whether there was contributory liability. And there are six items in those two cases which are virtual descriptions of what happened in this case. So, did the flea market have the power to control and monitor their tenants' activities? Yes. Did the flea market provide a necessary service or product to enable the fringing activities? They leased them space. They gave them parking. They provided them utilities. What is the nature and extent of the communication between the third party and the defendant? Well, here, the flea market had a manager and a security person that patrolled that flea market on a daily basis. They limited the parties that could, they limited what their tenants could sell. They knew exactly which tenants they would allow to sell sunglasses, which tenants they would allow to sell clothing to. So they understood who was doing what, and under the terms of their lease, they had to, they had the right to remove them if they did. If we go to the record, where would we find the evidence that this specific tenant was selling counterfeit sunglasses after receiving notice of counterfeit sales? That this one, not generally, that this tenant, McZotica, was selling counterfeit Ray-Bans in Oakley's. Where would we find that in the record? Well, there are two sources, Your Honor. First, at the time of the Detective Matthews' execution of a search warrant, or three, Detective Matthews, in 2013, he notified mall security that he was doing it. He left a copy of the search warrant, and he seized particular Oakley and Ray-Ban sunglasses, 2013. In 2014, following the major raid, Your Honor, where there were 20 search warrants executed, the defendants, Mr. Dickerson, the manager, admitted he went to each and every one of the booths that was raided, including those from which Ray-Ban and Oakley's sunglasses were seized. So within days after the September, I'm sorry, after the November 21 raid, testimony was he visited each one of those booths. He asked them if they were selling counterfeits, and they told him no. And as the court pointed out, Ms. Jamison said she expected them to lie because it was a violation of their lease. So that's the second one. The third one, Your Honor, is, well, first of all, in the lease, then the letter was sent by my client on December 3, I'm sorry, not December 3. It was sent on December 9, 2014. And while they didn't say which booths were involved, they said, if you see any Ray-Ban or Oakley sunglasses at your mall, they are counterfeit. We don't allow our sunglasses to be sold at these types of locations, particularly flea markets. Again, Your Honor, there were three or four undercover buys in early 2015, followed by a letter on April 23, 2015, and that's in the record, in which the L'Exotica sent another cease and desist, that's April 22, in which they identified the booths, A6, A8, E8, J13 to 15, exactly where they were. And then finally, an interesting thing, when the raid occurred in August of 2016, after all of the activity that the defendant's appellants claimed they undertook to stop this, posting signs, there were sunglasses found at JK, which was there from, I'm sorry, J9 and K8. That was where Matthews found them in 2013. So three years later, at the same location, J15, an undercover buy on October 12, again, on October, on August 8, 2016, and L5, which was March 17, 2015, again, on August 8, 2016. So there were repeat offenders, and they even renewed the lease of the J9 booth in 2000, from between 2014 to 2015, which was one of the repeat offenders involved here. So they had actual knowledge. It isn't just constructive, though. They had actual knowledge of which booths were involved. They actually controlled which booths could sell sunglasses. And the photographs in the record are clear. They show, if you walk down the hallways of this mini-mall, there are walls of sunglasses mounted on posts. So there are dozens and dozens of sunglasses. It's hard to miss. And so if you have a manager and a security guard monitoring these hallways on a daily basis, that evidence is there. And I just do want to point out that the courts note that this isn't, this is a brick-and-mortar store that you can actually see what's going on. This isn't the eBay case. In eBay, the court was confronted with an online marketplace. We all know what that is. But the interesting thing is it has 100 million listings, and they have 6 million listings a day. And the irony of reliance on eBay for a brick-and-mortar store, and why it's not appropriate, is the example of what should be the law in a brick-and-mortar store. It says, the court said, some contemporary knowledge of which particular listings are infringing or will infringe in the future. A listing is not a particular fixed location within a mall. These are places that are well-regulated. A listing is something that is put on through the Internet, and eBay had to monitor 6 million a day. There was nothing here that was changing on a daily basis. As a matter of fact, these stores were fixed, they had fixed locations, and they were easily monitored and controlled. And they had the right to remove, under the terms of their own leases, they had the right to remove any offending tenant who was selling counterfeits. And their position was, and this is why willful blindness is so apt in this case, the testimony of Ms. Jamieson, as well as Mr. Dickerson, was it didn't matter whether they were told by the manufacturer that these goods were counterfeit. It didn't matter that the police told them that these goods were counterfeit. So what's your response to their argument that they asked Luxottica for help in the expert who could identify what goods are counterfeit and also to provide witnesses to the undercover buys and so on to support dispossessor reactions? Those requests were made after the lawsuit was filed. And our position is, it was done solely as a ruse for the sake of being able to make that argument at the time of trial. The most telling evidence is that when they received the two letters from Luxottica, they never responded. Luxottica asked them for information. It was expected that their lawyer, Mr. Bridges, would respond, according to Ms. Jamieson. But he never did. They deliberately did not respond. They did not want help. They did not want to do anything. They just wanted to continue business as usual. And so our position is that the evidence is fairly overwhelming, fairly strong, that there was counterfeiting activity going on over a multiple-year period of time. As a matter of fact, Mr. Yeh, the father of the family, was informed in 2008 when he didn't even own the shopping center, he didn't operate the mall, he was told then by the College Park Police Department in an email that was sent to him and to Mr. Swindle, the former operator, that there were 19 booths in April of 2008 that were selling counterfeit goods. Police Department telling him they were selling counterfeit goods. He takes over in 2009, and you start seeing activity in 2012 and 2013 of manufacturers, brand owners, and police conducting raids and inspections and undercover buys. And it was fairly consistent, if not every month, but fairly consistent throughout a four-year period of time where counterfeit goods were found, they were notified that there was counterfeiting about it. They say they put up a sign. The jury saw the sign. The jury had the right to determine whether putting up a sign was in any sense undertaking any effort to negate their willful blindness, to negate their tolerance of this counterfeiting activity going on within their property during a significant period of time. And I don't need to say any more, unless the Court has any questions. I have nothing. Thank you, Mr. Mahfoud. Mahfoud. Mahfoud. Thank you, Your Honor. Mr. Dyckman. Your Honors, may it please the Court in rebuttal. Mr. Mahfoud's indication that my clients did not ask for help from L'Exotica is false. They did, and they did it before suit was filed. They did it at a meeting at the Homeland Security offices where not only did L'Exotica ask Homeland Security for help, specifically asked a woman named Jeanne Johanson, L'Exotica's representative for help, and offered to pay for that help before suit was ever filed. When was that, Mr. Dyckman? It was prior to the suit being filed. It was after, and I have a trial starting tomorrow in front of Judge Ray, so I have a little bit of a brain inventory problem today, but prior to suit, after a particular raid, a meeting was held at Department of Homeland Security's local offices. Ms. Johanson was there. It's well documented in the record. Well, the raid, as I recall, was April of 2014 involving DHS? I believe that's correct, Your Honor. It was a combined task force of state and federal officers. That was when they loaded up a tractor trailer full of counterfeit goods. Yes. And do keep in mind that each of these raids, as best the record reflects, were spurred on, set up, and ran by L'Exotica and Ms. Johanson. The Mr. Mahfoud referred to photos in the records demonstrating all sorts of sunglasses being for sale. I would have to ask then which photos because during trial, a massive amount of photos were introduced from an entirely different mall operated by Pat Swindle. Fortunately, through some very careful detail, we were able to establish that this had occurred. We were never able to establish which of the photos were genuine. The end result, Your Honors, is my client's efforts ultimately worked, and you see by the end, they're sending in undercover buyers who were not finding any glasses for sale at all. And they're asking, okay, on the side, can you do this? And they're being told, we can't do that because it's against the mall rules. So with no aid from the person who, the company that is primarily responsible for policing the trademark, we were able to make it work. Mr. Mahfoud talks about the renewal of tenants. Again, the record reflects that Booth J5 certainly was renewed, different tenant. Were there any tenants who had been tenants when Pat Swindle operated the mall who were still there during the time period when we're talking about? All I can say, Your Honor, is almost certainly. Almost certainly there were. There was that overlap. Many, many, many left. But I would just say with almost certainty, I do not have a specific recollection of the record of whether that was detailed, but I would say almost certainly some of them would have been holdovers. Some of these raids do run together because one of the raids which was discussed extensively at trial was a raid that occurred while Pat Swindle was operating the mall before we had any ability to step in and do anything. You don't know whether there were any tenants who were raided under Pat Swindle's watch who were subsequently the subject of undercover purchases or raids? I do not believe so, Your Honor. My recollection is, is the effort was made in the transition to use it as an opportunity to run things through a screen and make things cleaner and tighter, and I know a lot of money was put into the mall to elevate it. But I would be remiss if I spoke as fact as to that. The bottom line is, as Mr. Mahfoud said, that a jury could be entitled to believe that my client should have done more. That's a negligence analysis, whether you had to do more given the circumstances. This is willful blindness, which courts have referred to as ostrich-like behavior. There was no ostrich-like behavior here at all. And there was no, and there's no way to draw a logical distinction between bricks and mortar and online stores. The fact is, is eBay has an easier ability to get rid of people than my clients did because that's a license also. They can delist like that. That's part of the listing rules. Yet the court said, you got to tell them specific instances because, Tiffany, you're the expert. It's your thing. And that same rule should apply here, Your Honors. Thank you. Thank you, Mr. Dyckman. Mr. Mahfoud. The court is in recess until 9 o'clock tomorrow morning. All rise. Thank you.